POWERS (WEBB v.). See Case No. 17,323.

## Case No. 11,363.

### POWHATTAN STEAMBOAT CO. v. APPO-MATTOX R. CO.

[4 Quart. Law J. 100.]

District Court, E. D. Virginia. Feb., 1859. [1]

CONTRACTS MADE ON SUNDAY.

1. A promise to do what is forbidden by law, or a promise made in consideration of an act done in violation of law, is void; and the infliction of a penalty for the doing of any act is an implied prohibition of it.

2. The statute against laboring on the Sabbath applies to corporations.

3. A common carrier is not responsible for the failure to deliver goods delivered to him on Sunday.

The plaintiffs offered in evidence a statute of the state of Maryland, incorporating them in the name of the Powhattan Steamboat Company, and further introduced evidence tending to prove that for many years prior to the 26th day of June, 1853, they had run a weekly line of steamboats, for the transportation of goods and merchandise between the city of Baltimore and the city of Richmond, in the state of Virginia, which boats were accustomed on each trip to stop at City Point, on James river, for the purpose of landing goods and merchandise, destined for Petersburg, Virginia, and of receiving goods and merchandise sent from Petersburg; that the said goods and merchandise were conveyed between City Point and Petersburg in both directions, by means of a railroad between those places; that on the said 26th June, 1853, and for several years previously, the said railroad was the property of and operated by the defendants, a corporation created by the state of Virginia; that on the said 26th June, 1853, and during the whole period previously that the said railroad was owned and operated by the defendants, there was an arrangement and contract between the plaintiffs and defendants, for the transportation of goods and merchandise, by their respective lines of conveyance, between Baltimore aforesaid, and Petersburg aforesaid; that under the provisions of said arrangement and contract, goods and merchandise destined to be transported from Baltimore to Petersburg, were to be delivered in Baltimore to the plaintiffs, whose agent there was to give receipts therefor, promising to deliver such goods in Petersburg, and the said goods were to be carried by the plaintiffs upon their steamboats to City Point, and there delivered to the defendants, and by them transported on their railroad to Petersburg, and

---

[1] [Reversed in 24 How. (65 U. S.) 247.]

that the freight for the entire distance should be collected in Petersburg, by the agent of the plaintiffs, and one-fourth part thereof paid to the defendants; and that the plaintiffs and defendants entered upon the said course of transportation, and prosecuted the same regularly until the said 20th June, 1853; that according to the regular course of the transportation, one of the steamboats of the plaintiffs left Baltimore every Saturday, in the afternoon, and arrived at City Point at or shortly after noon on Sunday, and there, on the same day, delivered the goods and merchandise destined to Petersburg to the defendants, by depositing the same in the warehouse of the defendants, located on the wharf at City Point, adjacent to the road of the defendants, the agent of the defendants opening the warehouse for the purpose of enabling the plaintiffs to deposit the said goods and merchandise therein, and closing the same after the said goods and merchandise had been so deposited—the whole labor of landing the goods and merchandise, and depositing them in the warehouse, except the opening and closing the warehouse being performed by the plaintiffs; that according to the usual course of said transportation such goods and merchandise remained in the said warehouse until Monday morning, when they were transported by the defendants to Petersburg, and the steamboat of the plaintiffs, after so delivering the goods to the defendants, proceeded on Sunday up the river to Richmond; that on Saturday, the 25th of June, 1853, one of the steamboats of the plaintiffs left Baltimore as usual, having on board goods and merchandise destined for and to be conveyed in said boat to Richmond, and having on board also other goods and merchandise destined for Petersburg, for which the said plaintiffs had given their receipts in Baltimore to be delivered in Petersburg according to the contract and course of transportation aforesaid; that the said steamboat reached City Point about noon on Sunday, the 26th of June, 1853; that the agent of the defendants unlocked and opened the warehouse of the defendants to enable the plaintiffs to deposit therein the goods and merchandise destined for Petersburg, and that the plaintiffs on the same day landed the goods and merchandise destined for Petersburg, and deposited them in the said warehouse, which was thereupon closed by the said agent of the defendants— the whole labor of landing and depositing the goods except the opening and closing of the warehouse being performed by the plaintiffs, and that the said steamboat proceeded up the river to Richmond on the same day, and as soon as the said goods and merchandise destined for Petersburg had been landed and delivered as aforesaid, all which were according to the usual course of the said business; that on the same day the said warehouse and all the goods and merchandise aforesaid were destroyed by fire; that actions were instituted by sundry parties owning the said goods and merchandise against the said plaintiffs, in the circuit court of Petersburg, to recover the value of the said goods and merchandise; that immediately after the institution of the said actions, the plaintiffs gave notice to the defendants of the institution and pendency thereof, and that in case the plaintiffs should be held liable therein for the said goods and merchandise, they would claim reimbursement from the said defendants of the amount which they might be compelled to pay, and calling upon them to come in and defend the said actions; that the said actions were fully defended by the said plaintiffs, and verdicts and judgments rendered against them for the value of the said goods and merchandise, which said verdicts and judgments proceeded and were founded upon the ground of negligence and want of due care in the custody and preservation of the said goods and merchandise, in the warehouse aforesaid; that by the said verdicts and judgments the said plaintiffs were held liable for the sum of $12,000 and upwards, and were compelled to pay and did pay the same, for the recovery of which from the defendants, the present action is brought. And the plaintiffs further introduced evidence tending to prove that it was a part of the contract between plaintiffs and defendants, that in case the agent of the defendants should not be present at City Point, to open the warehouse, on the arrival of the steamboat on Sunday, the agents of the plaintiffs were authorized to open the said warehouse themselves, and deposit the said goods therein; that the usual time for the steamboat to leave Richmond on her return to Baltimore was in the afternoon of Tuesday, and that it was necessary for her to leave at that time, so as to reach Baltimore in time to discharge her cargo and take in another by the usual time of departure on Saturday; that unless the said boat reached Richmond by an early hour on Monday morning, it was necessary, to enable her to leave on Tuesday afternoon, that she should work all Monday night in discharging and receiving cargo; and that such extra labor on Monday night would have required the plaintiffs to employ a larger force, and subjected them to largely increased expenditure; and that the distance between City Point and Richmond could be run by said boat in some four or five hours. And it was proved that the president, directors, and stockholders of the plaintiffs' corporation are, and always heretofore have been, citizens of the state of Maryland, and that the president and directors of the defendants' corporation are, and have always heretofore been citizens of Virginia, and that the road and all the property of the defendants' corporation belong, and have always heretofore belonged, to the city of Petersburg, in Virginia.

The defendants, to sustain the issue on their part, introduced evidence to prove that, though the plaintiffs delivered the goods

from their boat into the warehouse of the defendants on Sunday, the 26th day of June, 1853, and had been in the habit of doing so on previous Sundays, they were allowed to do so only for the convenience and accommodation of the plaintiffs, and upon an understanding and agreement between the said plaintiffs and defendants that the said goods should, until Monday morning, be at the risk of the plaintiffs, the said defendants not doing any work on Sunday. And thereupon the defendants, by their counsel, moved the court to instruct the jury as follows: "If the jury believe from the evidence, that at the time of the fire in the declaration mentioned, the plaintiffs and defendants were engaged in the business of carrying goods and merchandise between Baltimore and Petersburg, in two steamboats, which plied between Baltimore and Richmond, conveying the goods and merchandise to City Point, and there delivering the same to the defendants, who carried them thence to Petersburg, over their railroad, and that in the usual course of transportation, the plaintiffs delivered from one of their steamers to the defendants at City Point, on Sunday of each week, the goods and merchandise which had been brought in the same from Baltimore, and was to be carried by the defendants from City Point to Petersburg, and that in accordance with that usage, the plaintiffs, who have carried the goods and merchandise in the declaration mentioned from Baltimore to City Point in their transit to Petersburg, delivered the same to the defendants on Sunday, the —— day of June, 1853, on Sabbath day, and that the said goods and merchandise were burned on the same day, Sunday, June —, 1853, that they must find for the defendants."

Macfarland & Roberts, Mr. Joynes, Mr. Tucker, and Mr. Patton, for plaintiffs.

Robinson & Jones and Mr. Gholson, for defendants.

HALLYBURTON, District Judge. The question for the decision of the court in this case is, whether the railroad company are liable, as common carriers, for the loss of goods delivered to them and accepted by them as such carriers, on a Sunday, to be carried by them on the following day, from City Point to Petersburg, which goods while in the warehouse or depot of the railroad company, were consumed by fire on the day on which they were delivered. It is too well settled as a principle of the common law to require discussion, that a promise to do what is forbidden by law, or a promise made in consideration of an act done in violation of law, is void; and it seems to be now equally well settled that the infliction of a penalty for the doing of any act is an implied prohibition of it. The rule is stated by Holt, Chief Justice (Bartlett v. Vinor, Carth. 252) in the following words, quoted by Tindal, C. J., in De Begnis v. Armistead, 10 Bing. 107: "Every contract made for or about any matter or thing which is prohibited and made unlawful by statute, is a void contract, though the statute does not mention that it shall be void, but only inflicts a penalty on the offender; because a penalty implies a prohibition, though there are no prohibitory words in the statute." And it is said in Cope v. Rowlands, 2 Mees. & W. 149, to be "perfectly settled that where the contract which the plaintiff seeks to enforce, be it express or implied, is, expressly or by implication, forbidden by the common or statute law, no court will lend its assistance to give it effect;" and that "it is equally clear that a contract is void, if prohibited by a statute, though the statute inflicts a penalty, only, because such penalty implies a prohibition." The general principle above laid down, has also been sanctioned by the supreme court of the United States in the cases of Armstrong v. Toler, 11 Wheat. [24 U. S.] 258; Groves v. Slaughter, 15 Pet. [40 U. S. 449]; and Harris v. Runnels, 12 How. [53 U. S.] 80. And a great number of cases, both in England and the United States, have decided that contracts and agreements to do what is forbidden by the statutes enacted for the purpose of enforcing the observance of the Sabbath, and contracts made in consideration of acts done in violation of those laws, are utterly void. The statute of Virginia, in relation to labor on Sunday, to be found in Code Va. 1849, pp. 740, 741, is in the following words: "If a free person on a Sabbath day be found laboring at any trade or calling, or employ his apprentices, servants or slaves in labor, or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant, apprentice or slave is so employed, constituting a distinct offence. No forfeiture shall be incurred under the preceding section for transportation on Sunday of the mail, or passengers, or their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath and actually refrains from all secular business and labor on that day, provided that he does not compel a slave, apprentice or servant, not of his belief, to do similar work or business on Sunday, and does not on that day disturb any other person."

And the court has now to inquire whether such a contract as that to which we have above referred, between the steamboat and railroad companies, is annulled by the statute above recited or not. That for one carrier to deliver goods to another, to whom by his contract he is bound so to deliver them, is to labor in his calling, is clear. It is said, however, that the parties to this suit are incorporated companies, and that our act of assembly does not apply to corporations, nor to vessels engaged in the carrying trade between different states of the Union; and

moreover, if it did, that such a delivery of goods as has been supposed, is a work of necessity within the meaning of the act; but we have a statute which expressly declares, that "the word 'person' may extend and be applied to bodies politic and corporate, as well as individuals"; and without referring to that, I have no doubt that the legislature intended to prohibit corporations, which are only associations of individuals, as well as to prohibit individual persons, from engaging in their ordinary business on the Sabbath. It will not be seriously affirmed that our banks may open their doors, and discount notes, and carry on their usual business on Sundays, without any breach of the law; or that our railroad companies may lawfully receive, and carry and deliver merchandise on Sundays, as on the other days of the week. As to steamboats and other vessels engaged in commerce between the states, or between the United States and foreign countries; although the power to regulate such commerce be conferred upon congress exclusively, by the federal constitution, yet the police regulations of the several states have never been held to be prohibited by that instrument; and the law in relation to the observance of the Sabbath is merely a regulation of the police. It was intended solely to promote good order, and morality and religion, and not at all as a commercial regulation, though like many other police regulations, it may indirectly affect commerce to some extent. Besides, the delivery of the goods and the receipt of them, in the case supposed, were acts done upon the land; and if it were conceded that the statute of Virginia was not meant to be applied to ships, while under weigh upon any bay or navigable river; or to meddle with any thing done on board of them within the admiralty and maritime jurisdiction of the United States, and before they have reached the shore; it would by no means follow, that it would not be applicable to such acts, such as we have mentioned, done on land. Many cogent, and perhaps conclusive reasons may be given why a vessel, coming in from sea, or that may be pursuing on Sunday, a voyage previously commenced, and when the labor of arresting her progress might be "as tedious" as going on, should not be required to come to anchor, as soon as she enters the limits of a state; and why the statute should not be held to apply to such a case; which would not be at all applicable to the case before the court.

The delivery of the goods may be justified, by necessity; but what is a work of necessity within the meaning of the act of assembly? For what end and purpose must the act be necessary, in order to be lawful? What is necessary for any purpose whatever may, in that point of view, be regarded as a work of necessity; but the question recurs whether it be necessary to an end which the law sanctions, and which is not attainable any other way; and for the attainment of which it may be fairly concluded that the law intended that labor might be done on Sunday. It might be very important to a merchant, so far as profit was concerned, that he should expose to sale on Monday goods, which he had received on Saturday; and in order that he should be able to do so it might be absolutely necessary that he should work on Sunday in opening and arranging them; but could he lawfully do so? Would that be the sort of necessity which the law contemplates? It might be of much pecuniary benefit to a farmer that he should ship a load of wheat, and send it to market, by a vessel which was to sail on Monday morning, and to accomplish that end it might be indispensably necessary that the wheat should be winnowed and prepared for market on Sunday; but would that be a work of necessity in contemplation of law? If, on the other hand, it be lawful to carry on commerce with foreign countries, it must also be lawful that seamen should work on Sunday in crossing the ocean; because otherwise such commerce could not possibly be carried on. Sunday labor is indispensable to the attainment of that end; and if the end be clearly a lawful one, the means must be so too. This would be true, even if our act extended over the ocean, which it does not. The charters and laws by which banks are created, and which permit the business of banking to be carried on, and large amounts of money to be deposited and kept constantly in them, allow, by necessary implication, that a watch may be kept on Sundays, as well as on other days, to guard the property of the banks, and of those who deal with them; as it could not be fairly and reasonably supposed that the legislature intended that such property should be left unprotected; but they may not transact their ordinary business on Sunday, because that is not necessary to the end for which they were established.

A person may lawfully employ a servant in driving his carriage, in order to convey his family to church on Sunday; because it would be unreasonable so to construe a law intended for the advancement of religion and morality in such a way as to hinder the performance of religious duties. So, if a house takes fire, the owner may extinguish it on Sunday, though the labor of doing so may be very great and fatiguing, because such labor cannot be in conflict with any rule of morality or religion, or any object which the law may be supposed to have had in view, and it is a work of necessity, since it must be done at once, or not at all. A common carrier, too, who may be obliged, in the course of a long journey, to retain in his possession, on Sunday, goods which have been entrusted to him, may certainly watch over them himself, and employ others in doing so, on that day; but to travel with them, and deliver

them out of his custody, on the Sabbath, though it may be convenient, is not a matter of necessity, in any sense, unless on an emergency, when it might be necessary for their safety to remove them; as, if the ships containing them were to take fire, or be in a sinking condition. If a steamer might deliver her cargo to the owners, or deposit it in a warehouse at City Point, on Sunday, in order that she might not be delayed in her voyage to Richmond, why might not the same steamer, and every other vessel that might arrive in the harbor of Richmond, and not have time to deliver her cargo sooner, unlade or continue the work of unloading on Sunday, in order that she might begin her return voyage on Monday? And if so, might not merchants receive the goods on that day, and send drays to convey them; and Sunday thus be made, instead of a day of rest, a day of as much business as any other day in the week? This consequence appears to me to follow irresistibly. The inconvenience of delaying steamers and other vessels may, in a commercial point of view, be very considerable; but the merchant, the mechanic, the farmer, and men of business of all sorts, may sustain great loss and inconvenience from not being permitted to engage in their usual occupations on Sunday. The results of a general suspension of labor throughout the land on every seventh day are immense; the diminution of the products of labor in that way may be enormous, but these results were in the contemplation of the legislature of the states, and the due observance of the Sabbath, thought to be an object worth them all.

It has been argued, further, that if the labor of delivering the goods were unlawful, the mere receipt of them and acceptance of their delivery by the railroad company was not a labor, in violation of law. The answer to this argument is, in the first place, that in the case supposed it forms a part of the contract that the goods shall be delivered and received on Sunday, and the carrier who, in pursuance of such agreement, merely unlocks his warehouse and allows the merchandise to be deposited there, and locks them up, is aiding and abetting another in doing an unlawful act, as much as one who watches whilst a burglar is breaking a house; and his contract to do so, and keep them afterwards, is therefore unlawful and void, even if his acts be not regarded as labor in his calling. Another answer is that, to be obliged to be present when the goods were delivered, and unlock the door, and remain until they were deposited in the warehouse, or return to lock the door, might be a very disagreeable and troublesome labor, requiring much time, and depriving the person who performed it of all the advantages of the Sabbath. And thirdly, it may be answered that, if the law allow a person to enter into a binding agreement to receive and keep goods on a Sunday, and makes him responsible as carrier for neg-

lecting to keep them safely, it certainly must be lawful for him to protect himself from loss, not only by locking the door of his warehouse, but by taking an inventory of the goods delivered, and employing persons to guard them, and do all other acts which may be necessary to ensure their safety; in other words, to labor in his calling on the Sabbath.

Therefore, while I refuse to give the instructions asked for in the precise language in which they are written, I instruct the jury as follows: "The court instructs the jury, that if they shall be satisfied by the evidence in this cause that the plaintiffs and defendants were common carriers at the time of delivery and acceptance of the goods hereinafter mentioned; and that said goods were brought to City Point by the Powhattan Steamboat Company, or their lawful agents, as carriers, and were so delivered by them to the Appomattox Railroad Company, or their lawful agents, and accepted by them as common carriers; and that said railroad company unlocked their warehouse at City Point, in order that the goods might be stored therein, and afterwards locked them in, under a contract or understanding, express or implied, between said companies, that said goods were to be so delivered by the said steamboat company, and accepted and to be conveyed on the following day by the said railroad company, as common carriers as aforesaid, from City Point to Petersburg, and that said goods, after having been so deposited in said warehouse, and while remaining therein, were destroyed by fire, through the negligence and want of care of said railroad company, or its agents; yet, if they shall be further satisfied by the evidence that said goods were so delivered and accepted on a Sunday under a contract, express or implied, as aforesaid, that they might be so delivered, and would be so received and accepted on that day, between the said companies or their lawful agents, and were destroyed by fire on the day they were so delivered and received, to wit: on Sunday, the 26th June, 1853, then the jury should find for the defendants."

[NOTE. The jury brought in a verdict for the defendant. The plaintiff then took the case to the supreme court on writ of error, and the judgment of this court was reversed, and the cause remanded, with directions to issue a new venire. 24 How. (65 U. S.) 247.]